UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

HENRY BARRINGTON,

                 Plaintiff,

      -against-

THE STATE OF NEW YORK, *et al.*,

           Defendants.

------------------------------------------------------------

08 Civ. 5274 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

     In this suit under 42 U.S.C. § 1983, plaintiff *pro se* Henry Barrington alleges that prison officials violated his constitutional rights by assaulting him in retaliation for filing grievances about certain disciplinary actions taken against him.  Defendants the State of New York and certain correctional officers at Green Haven have moved for summary judgment on all claims.  For the following reasons, their motion is granted in part and denied in part.

## BACKGROUND

     At all times relevant to this suit, Barrington was incarcerated at the Green Haven Correctional Facility.  Barrington alleges that on May 25, 2005 he was awaken "by a loud sounding bang" and opened his eyes to see defendant correctional officer James Titka standing in front of his cell with a baton.  (2d Am. Compl. ("Compl.") ¶ 19; Dec. of H. Barrington, Jan. 13, 2011 ("Barrington Dec."), Ex. A.)  At some point, Titka told Barrington to turn down his radio which Barrington alleges was playing a low volume through his headphones.  Barrington did so and returned to sleep.  (*See id.;* Compl. ¶ 19.) Some time later, Barrington was awoken by "another loud bang" and opened his eyes to

1

see defendant correctional officer Jeremy Burch with baton in hand.   (*See id.* at ¶ 20.)
Barrington alleges that Burch demanded that Barrington surrender his radio and used a
racial epithet in doing so.   (*See id.*)  Barrington complied.

      After Barrington's unit was called to breakfast, Barrington approached the
officers' station and asked Burch for a receipt for his confiscated radio and a grievance
form to challenge the confiscation.  (*See id.* ¶ 21.)  Burch and defendant correctional
officer Jeffrey Ohl responded by chastising Barrington with racial slurs and instructed
Barrington to return to his cell.  (*See id.*)  Titka then came to Barrington's cell and told
him that he would get his radio back but that he would receive a disciplinary ticket if he
insisted on a receipt.  (*See id.* ¶ 22.)  Titka again used racial epithets in speaking with
Barrington.  (*See id.*)

      Later on May 25, Barrington obtained a grievance form from another prisoner and
completed it with his complaint regarding the events regarding his radio.  (*See id.* ¶ 23.)
Barrington had another prisoner drop the complaint in the designated grievance box on
May 26, 2005.  (*See id.* ¶ 24.)

      The following day, May 27, 2005, Barrington again woke to Titka banging on the
bars of his cell.  Titka waived a copy of Barrington's grievance and, again using racial
slurs, stated that Barrington "could write" but that "me and my boys going to get you."
(*Id.* ¶ 25.)  Titka added, "I am going to be off for three days but me and boys are going to
get you."  (*Id.*)  Titka then called Ohl's attention to what Barrington had written and
stated, "I have a good mind writing him another misbehavior report."  (*Id.*)

      On May 30, 2005, Barrington stepped out of his cell to have his scheduled shower
and recreational time.   (*See id.* ¶ 27.)  As he did so, defendant correctional officer

Christopher Morrow told him to stand against the cage at the officers' station.  (*See id.*)

Ohl, Burch, and defendant correctional officers Michael Canazzi and Brian Crossman

were present at the station.  Ohl stepped out and asked Barrington what was in his

pockets.  (*See id.* ¶¶ 27-28)   Barrington emptied his pockets and presented the contents

to Ohl.  (*See id.* ¶ 28.)  Burch then stepped out of the station.  (*See id.*)  Ohl again asked

Barrington what was in his pockets, this time in an angry tone.  (*See id.* ¶ 29.)

Barrington avers that, moments later, Ohl body-slammed him to the ground and

began kicking and stomping on him while Canazzi and Crossman took hold of his legs.

(*See id.* ¶¶ 30-31.)  Ohl, Burch, and Marrow allegedly then knelt over Barrington and

began punching him in the head.  (*See id.* ¶ 31.)  Canazzi allegedly began twisting

Barrington's leg, causing him to cry out in pain, as Ohl, Burch, and Marrow continued to

punch him in the head.  (*See id.* ¶¶ 31-32.)  According to Barrington, Burch and Marrow

then withdrew, but Ohl continued punching Barrington and then began choking him.

(*See id.* ¶ 32.)  Barrington avers that he was then dragged down the hall, handcuffed, and

taken to the Green Haven health clinic.  (*See id.* ¶¶ 33-36.)  Barrington was later taken by

ambulance to a local hospital where he received surgery on a fractured leg.   (*See id.* ¶ 37;

Barrington Dec. Exs. I, J, W, Z. HH, II, JJ.)

The May 25 incident was recorded in misbehavior and other facility incident

reports, as a result of which Barrington was confined to a special housing unit.  (*See*

Compl. ¶¶ 38-39.)  In these reports, the officers uniformly reported that their use of force

was a response to Barrington's abrupt turn to his left in what appeared to be an attempt to

elbow Ohl.  (*See* Barrington Dec. Exs. B, C, D, E, F, G, L.)[1]   Barrington filed a grievance regarding the assault and what he alleged to be false reports regarding it.  (*See* Barrington Dec. Ex B.)  The grievance was denied by the Green Haven Superintendent. (*See id.* Exs. B, R.)  Barrington appealed and his appeal was denied.  (*See id.* Exs. S, T.)

On April 26, 2006, Barrington, represented by counsel, filed a suit in the New York Court of Claims against the State of New York alleging that the State was liable for the excessive force used by corrections officers in the May 30, 2005 incident (the "Court of Claims Action"). (*See* Dec. of W. Bauman ("Bauman Dec."), Nov. 30, 2010, Ex. H.)

Barrington filed the original complaint in this action on May 8, 2008 alleging that the May 30, 2005 incident was an assault in retaliation for his filing a grievance regarding the May 25, 2005 incident.

Shortly thereafter, the Court of Claims Action proceeded to a bench trial as to liability only at which Barrington, Burch, Ohl, and another correctional officer Huttel testified.  (*See* Bauman Dec. Ex. I.)  On July 25, 2008, the Court of Claims found that "virtually none of the witness testimony" at the trial "bore any sign of 'absolute truth.'" (*Id.* at 10.)  However, the Court of Claims found that Barrington's "description of the encounter, supported by the limited corroborative testimony of Titka and the objective evidence of his injury, were more credible than that offered by the officers involved. . . ." (*Id.* at 12.)   Accordingly, the Court of Claims was "constrained to conclude, based on the totality of the evidence, that a much greater degree of force than was necessary to respond to the situation was applied by these officers."  (*Id.* at 11.)

---

[1] The officers gave the same testimony in an investigation undertaken by the Inspector General of the New York State Department of Correctional Services.  (*See* Barrington Dec. Exs. V, X, Y.)

Notably, Barrington "presented considerable testimony and evidence concerning the confiscation of his radio and the resulting grievance contending that this was the motivating factor behind the May 30 incident. . . ." (*Id.* at 9.)  However, the Court of Claims found that "final determination of the May 25 incident [wa]s not necessary to decide this claim":  since "[t]he gravamen of the claim at bar [wa]s that excessive force was used," it was "irrelevant whether the officers were motivated by some desire to exact revenge for the May 25 incident and resulting grievance." (*Id.*)

A trial on damages then ensued.  The physician who treated Barrington testified on his behalf and another expert orthopedic surgeon testified for the State.  Following that trial, on June 19, 2008, the Court of Claims awarded Barrington $105,000 for past pain and suffering and $30,000 for future pain and suffering.  (Bauman Dec. Ex. J at 8.) Judgment was entered against the State for $147,082.50 on July 23, 2009.  (Bauman Dec. Ex. K.)

On July 25, 2008, Ohl was served with Barrington's original complaint in this action.  Burch was served with the same on August 7, 2008.

That same day, Barrington was at the law library when he was informed that he had a visitor.  (Compl. ¶ 50.)  Barrington proceeded to his cell area but was sent back to the law library because officers there had purportedly called him back.  (*Id.*)  Yet when Barrington returned to the law library, he was told to return to his cell area.  (*Id.*) Barrington did so and was met by defendant correctional officer Michael Funk who gave him a pass and told him to "hurry up." (*Id.* ¶ 51.)  In the cell, Barrington noticed that his pass read "8:30 a.m." when the hour was by then 9:38 a.m.  (*Id.* ¶ 52.)  Barrington took the pass to Funk and told him that he believed that the incorrect time was an attempt to

set him up on a violation of being outside his assigned area without authorization.  (*Id*.)
Funk responded by ordering Barrington on "Keep-Lock," a restricted status.  (*Id.*)

Shortly thereafter, Funk left his post in the cell area and escorted Barrington to the
holding area adjacent to the visitors' area.  (*Id.*)  Funk then proceeded to search
Barrington.  According to Barrington, during the search, Funk grabbed Barrington's
genitals and told him "I am going to fuck you" and "You are my bitch."  (*Id.*)  Barrington
avers that after completing the search Funk left in "uproarious laughter."  (*Id.*)
Barrington avers that Funk has told him on several occasions that he was present during
the May 30, 2005 incident and has asked him if his leg hurts.  (*Id*. ¶ 54.)  In a sworn
declaration, Funk has denied threatening Barrington or intentionally touching his genitals
and described any such contact as incidental to a proper pat-and-frisk search pursuant to
Department of Correctional Services regulations.  (Dec. of M. Funk, Nov. 30, 2010, ¶ 3,
Exs. A, B.)

Later on August 7, 2008, Funk filed a misbehavior report alleging that Barrington
was disruptive and resistant during the pre-visit search.  (*See* Barrington Dec. Ex. AA.)
Barrington avers that this report was false.  (Compl.  ¶ 53.)  He filed a grievance
regarding the August 7, 2008 incident and the subsequent misbehavior report.
(Barrington Dec. Ex. BB.)  The charges in Funk's report were later dismissed on the
ground that no staff witness was available to substantiate them.  (*See id.* Ex. FF.)

On December 1, 2008, Barrington moved to amend his complaint to correct the
names of one of the defendants and to identify certain John Does.  Magistrate Judge
Freeman instructed Barrington to move for leave to file a second amended complaint.
Barrington moved for leave on January 23, 2009.  Judge Freeman granted the motion

with respect to retaliation claims against defendants Marrow, Canazzi, Crossman, Titka, and Funk but denied the motion in all other respects.  (*See* Bauman Dec. Ex. C.)

On November 30, 2010, Defendants moved [62] for summary judgment on all claims.

## LEGAL STANDARD

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. Proc. 56(e).  "This requirement has particular relevance when a party's responsive documents are long on speculation and short on specific facts."  *Medici Classics Prods., LLC v. Medici Group, LLC*, 683 F. Supp. 2d 304, 307 (S.D.N.Y. 2010); *see Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 85 (2d Cir. 2005) ("The law is well established that conclusory statements, conjecture, or speculation are inadequate to defeat a motion for summary judgment.") (quotation marks omitted).  However, "[a] verified complaint is to

be treated as an affidavit for summary judgment purposes, and therefore will be

considered in determining whether material issues of fact exist, provided that it meets the

other requirements for an affidavit under Rule 56(e)." *Colon v. Coughlin*, 58 F.3d 865,

872 (2d Cir. 1995).   Since Barrington verified his complaint under penalty of perjury, the

complaint can serve as an affidavit for summary judgment purposes.

## DISCUSSION

### A.  Sovereign Immunity

Barrington has brought claims against both individual correctional officers and

the State of New York.   However, the State of New York is immune from those claims

under the Eleventh Amendment to the United States Constitution.   Though the Eleventh

Amendment provides that "[t]he Judicial power of the United States shall not be

construed to extend to any suit in law or equity, commenced or prosecuted against one of

the United States by Citizens of *another State*," U.S. Const. amend. XI (emphasis added),

"it has been construed more broadly to render states and their agencies immune from

suits brought by private parties in federal court." *In re Charter Oak Assocs.*, 361 F.3d

760, 765 (2d. Cir. 2004) (citing *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54

(1996)).   Hence, as interpreted by the Supreme Court, "[t]he ultimate guarantee of the

Eleventh Amendment is that nonconsenting States may not be sued by private individuals

in federal court." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).

"State sovereign immunity is not absolute, however.   It is subject to two

qualifications.   First, Congress can abrogate a state's immunity if it unequivocally

expresses its intent to do so and acts 'pursuant to a valid exercise of power.'   Second, a

state can waive its immunity from suit." *In re Charter Oak Assocs*, 361 F.3d at 765

(quoting *Seminole Tribe,* 517 U.S. at 55). Neither exception applies here. Barrington's claims sound in 42 U.S.C. § 1983, part of the Civil Rights Act of 1871 which Congress enacted pursuant to the Fourteenth Amendment. But "[i]t is well-settled that Congress did not abrogate the Eleventh Amendment in enacting section 1983." *Schoon v. Berlin*, No. 07 Civ. 2900, 2011 WL 1085274, at *5 (S.D.N.Y. Mar. 23, 2011) (citing *Quern v. Jordan*, 440 U.S. 332, 342 (1979)) ("Neither logic, the circumstances surrounding the adoption of the Fourteenth Amendment, nor the legislative history of the 1871 Act compels . . . the conclusion that Congress intended by the general language of the Act to overturn the constitutionally guaranteed immunity of the several States."). And it is "well-established that New York has not consented to § 1983 suits in federal court. . . ." *Mamot v. Bd. of Regents,* 367 Fed. App'x 191, 192 (2d Cir. 2010) (internal citations omitted). Accordingly, Barrington's claims against the State of New York must be dismissed.

### B. Collateral Estoppel

Section 1983 claims such as Barrington's are subject not only to sovereign immunity but also to the doctrine of *res judicata. See Allen v. McCurry*, 449 U.S. 90 (1980). "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Id.* at 94. "*Res judicata* does not require the precluded claim to actually have been litigated; its concern, rather, is that the party against whom the doctrine is asserted had a full and fair opportunity to litigate the claim." *EDP Med. Computer Sys, Inc.* v. *United States*, 480 F.3d 621, 626 (2d Cir. 2007). That is, the doctrine "bears on 'the effect of a judgment in foreclosing litigation of a matter that never has been litigated,

because of a determination that it should have been advanced in an earlier suit.'" *Nestor v. Pratt & Whitney*, 466 F.3d 65, 70 (2d Cir. 2006) (quoting *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984)).   Hence *res judicata* generally "bars all other claims relating to the same transaction against the same defendant that could have been brought at that time." *N. Assur. Co. of Am. v. Square D Co.*, 201 F.3d 84, 87 (2d Cir. 2000).

Under 28 U.S.C. § 1738, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Allen,* 449 U.S. at 96.   Defendants contend that the judgment of the New York Court of Claims bars Barrington's present suit. Accordingly, application of *res judicata* turns on whether a New York state court would give any preclusive effect to the Court of Claims judgment. *See Giannone v. York Tape & Label, Inc.*, 548 F.3d 191, 192-93 (2d Cir. 2008) ("When determining the effect of a state court judgment, federal courts, including those sitting in diversity, are required to apply the preclusion law of the  rendering state.") (quotation marks omitted).

"New York employs a 'transactional approach' to *res judicata*" whereby "'once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.'" *Yoon v. Fordham Univ. Faculty and Admin. Retirement Plan*, 263 F.3d 196, 200 (2d Cir. 2001) (quoting *O'Brien v. City of Syracuse,* 429 N.E.2d 1158, 1159 (N.Y. 1981)).   However, "a later claim arising from the same nucleus of facts as a previously adjudicated claim is not barred if the initial forum lacked the power to grant the full measure of relief sought in the later litigation." *Pack v. Artuz*, 348 F. Supp. 2d

63, 69 (S.D.N.Y. 2004).   For example, *res judicata* does not operate to bar a plaintiff's claim if "'formal jurisdictional or statutory barriers' prevented him from 'presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law.'"   *Jacobson v. Fireman's Fund Ins. Co.,* 111 F.3d 261, 265 (2d Cir. 1997) (quoting *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir. 1986)).

That was the case with Barrington's Section 1983 claims against the officers in their individual capacity.   Correction Law § 24 provides that "[a]ny claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state."   N.Y. Correct. Law § 24(2).   Accordingly, under New York law applicable at the time that Barrington filed the prior action, Barrington had no choice but to proceed in the Court of Claims against the officers in their official capacities, that is, against the State. Yet "it has long been recognized that the Court of Claims lacks the jurisdiction to hear claims against individual defendants, even where those persons are State employees." *Holmes v. State*, 782 N.Y.S.2d 571, 573 (Ct. Cl. 2004); *see also Pack*, 348 F. Supp. 2d at 68 n. 7 ("[T]he Court of Claims has jurisdiction over tort claims brought against the State and over damages claims brought against state employees in their official capacities, but not over claims brought against state officials in their individual capacities.").   Rather, the jurisdiction of the Court of Claims is "generally limited to claims for damages against the State, including suits that result from the torts of its officers and employees while acting in such capacities."   *Holmes*, 782 N.Y.S.2d at 573 (internal citations omitted).

11

For that reason, courts in this Circuit have held that a suit in a forum where state employees may only be sued in their official capacities does not bar an action against those employees in their individual capacities.  *See, e.g.*, *Gargiul v. Tompkins,* 790 F.2d 265, 272-73 (2d Cir. 1986) (holding that, since "damage claims in an Article 78 proceeding may only be asserted against individuals in their official capacities," the plaintiff "could not have recovered damages against the education officials in their individual capacities" and therefore "cannot be barred by *res judicata*") (internal citations omitted); *Pack*, 348 F. Supp. 2d at 69-70; *Palmer v. Goss*, No. 02 Civ. 5804, 2003 WL 22519446, at *3 (S.D.N.Y. Nov. 5, 2003) ("Because Palmer could not have brought his claim against Goss in his individual capacity in the New York Court of Claims, res judicata does not apply to prevent him from raising it in another forum."); *Cox v. C.O. Colgane*, No. 94 Civ. 6361, 1998 WL 148424, at *4 (S.D.N.Y. Mar. 27, 1998) ("Due to the restrictive jurisdiction of the Court of Claims, however, Plaintiff could not have sued C.O. Colgane as an individual in the initial forum.  Therefore, to the extent that the instant suit is directed against Defendants' in their individual capacities, claim preclusion does not operate as a bar."); *Wright v. Coughlin*, No. 85 Civ. 0624, 1987 WL 19633, at *1 (S.D.N.Y. Nov. 5, 1987) ("The jurisdiction of the Court of Claims is limited to actions brought solely against the State.  Thus, *res judicata* cannot bar the plaintiff in this action.") (internal citation omitted).  Accordingly, *res judicata* does not bar Barrington's action against the individual defendants in their individual capacities.

That is not the end of the matter, however.  Unlike most *res judicata* cases where a defendant argues that the plaintiff has already lost once and now wants a second bite at the apple, Defendants here argue that Barrington has already won and now wants a

12

second apple.[2]  That is, Defendants contend that permitting Barrington to bring this suit

would permit "double recovery."  (Defs.' Br. at 10.)

"It has been broadly stated that judicial policy forestalls a double recovery for an

injury."  *Zarcone v. Perry*, 434 N.Y.S.2d 437, 443 (2d Dep't 1980) (internal citation

omitted).  However, it is not clear that permitting Barrington to proceed would give him a

windfall.   "[P]unitive damages are not compensatory and could not cause any double

recovery."  *Ostano Commerzanstalt v. Telewide Sys., Inc.*, 880 F.2d 642, 649 (2d Cir.

1989) (rule against double recovery required crediting liability for breach of contract

against actual damages for fraud but not against punitive damages award).  Barrington

could not have obtained punitive damages in the Court of Claims Action because the

New York "Court of Claims Act does not permit punitive damages to be assessed against

the State or its political subdivisions."   *Sharapata v. Town of Islip,* 437 N.E.2d 1104,

1105 (N.Y. 1982).  In contrast, "a jury may be permitted to assess punitive damages in an

action under § 1983 when the defendant's conduct is shown to be motivated by evil

motive or intent, or when it involves reckless or callous indifference to the federally

---

[2] For that reason, Defendants' reliance on issue preclusion is misplaced.  To be sure, the
same courts that have held that a suit against the state or officials in their official capacity
*does not* have *claim* preclusive effect on a subsequent suit against officials in their
individual capacity have held that *issue* preclusion *does* apply in such circumstances.  *See
Cox*, 1998 WL 148424 at *6-*7; *Wright*, 1987 WL 19633, at *2.   However, the courts in
those cases relied on issue preclusion to dismiss the actions because the plaintiffs had lost
the prior suits.  *See Cox*, 1998 WL 148424 at *2; *Wright*, 1987 WL 19633, at *1.  In
contrast, Barrington won his suit in the Court of Claims which held that "final
determination of the May 25 incident"—the alleged precursor to the May 30 retaliation—
"[wa]s not necessary to decide" Barrington's assault claim.  (*See* Dec. of W. Bauman,
Nov. 30, 2010, Ex. I. at 9.)  Accordingly, the issue of whether the May 30 incident was
retaliation was either (a) not "necessary to support a valid and final judgment on the
merits," *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 918 (2d Cir. 2010), or
(b) was decided against Defendants.  Issue preclusion therefore cannot sustain summary
judgment for Defendants.

protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983).   And "punitive damages may be awarded in the absence of a compensatory award" or even an award of nominal damages.  *King v. Macri*, 993 F.2d 294, 297-98 (2d Cir. 1993).  Yet Barrington could not have brought his Section 1983 claim in the Court of Claims because "[t]he Court of Claims does not have jurisdiction to hear civil actions for alleged violations of the United States Constitution, as a State is not a 'person' amenable to suit under 42 U.S.C. § 1983."  *Mickens v. State*, 881 N.Y.S.2d 854, 863 (Ct. Cl. 2009).

Accordingly, this case implicates the rule that "*res judicata* will not be applied if the initial forum did not have the power to award the full measure of relief sought in the later litigation."  *Davidson v. Capuano*, 792 F.2d 275, 278 (2d Cir. 1986).  Indeed, "[w]here 'formal barriers' to asserting a claim existed in the first forum it would be 'unfair' to preclude the plaintiff from a second action in which he can present those phases of the claim which he was disabled from presenting in the first.'"  *Antonsen v. Ward*, 943 F.2d 198, 201 (2d Cir. 1986) (quoting Restatement (Second) of Judgments § 26(1)(C) cmt. c (1982)).   With respect to this "exception to *res judicata*," "the inquiry centers on . . . whether the court had the power to grant [the plaintiff] the relief sought in the present action."  *Bourgos v. Hopkins*, 14 F.3d 787, 792 (2d Cir. 1994).

On that question, the Second Circuit has repeatedly held that *res judicata* does not bar a plaintiff who has secured relief in a limited state proceeding from later seeking damages that were unavailable in the prior proceeding.  *See, e.g.*, *Burgos*, 14 F.3d 787 (prior state habeas corpus proceeding in which damages were not available did not bar Section 1983 claim in federal court); *Antonsen*, 943 F.2d 198 (same re: Article 78 proceeding where plaintiff had won reinstatement, back pay, and withheld benefits);

14

*Davidson*, 792 F.2d 275  (same).  And the New York Court of Appeals has endorsed that

application of New York *res judicata* law.  *Cf. Parker v. Blauvelt Volunteer Fire Co.,*

*Inc.*, 712 N.E.2d 647, 650 (N.Y. 1999) (noting that the court had "impliedly indicated our

agreement with the Second Circuit's holding in *Davidson v. Capuano*" and holding that

"the termination of the prior article 78 proceeding on the merits was not res judicata as to

the section 1983 damage claims.").

Defendants argue that the fact "[t]hat plaintiff was unable to seek punitive

damages in his Court of Claims action does not avoid issue preclusion." (Defs.' Reply at

3.)  But nothing in the Second Circuit's decisions in *Burgos* and its progeny suggests that

the *res judicata* exception applies only where the plaintiff could not obtain compensatory

damages.   Nor does the section of the Restatement (Second) of Judgments on which

both the Second Circuit and the New York Court of Appeals relied.  Rather, the

Restatement provides in general terms that *res judicata* does not apply where

> [t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain
> remedy or form of relief in the first action because of the limitations on the
> subject matter jurisdiction of the courts or restrictions on their authority to
> entertain multiple theories or demands for multiple remedies or forms of relief in
> a single action, and the plaintiff desires in the second action to rely on that theory
> or to seek that remedy or form of relief.

Restatement [Second] of Judgments § 26[1][c].  The Court therefore reads the *Davidson*

line of cases for the proposition that a plaintiff who makes use of a limited state

proceeding does not sacrifice claims to broader relief available under Section 1983 in

federal court.  In other words, nothing in *res judicata* doctrine requires a plaintiff to

choose between the limited right the State has given him and the more expansive right

Congress has given him to vindicate violations of the Constitution of the United States.

Here, there was no court in which Barrington could have brought both (a) an excessive force claim under state law against the State of New York and the officers in their official capacities; and (b) a Section 1983 claim against the officers in the individual capacities for which punitive damages are available.  As noted above, the State of New York and its officers in their official capacity cannot be sued in federal court.  Moreover, at the time Barrington filed his prior action, New York courts held that the phrase "[n]o civil action shall be brought in any court of the state" in Corrections Law § 24 deprived the New York State Supreme Court of jurisdiction over all damage claims—under Section 1983 and under state law—against correctional officers in the personal capacities.[3]   And the Court of Claims lacks jurisdiction over any claims, whether under Section 1983 or state law, against officers in their individual capacities and has no power to award punitive damages.  *See Sharapata,* 437 N.E.2d at 1105; *Mickens*, 881 N.Y.S.2d at 862; *Holmes*, 782 N.Y.S.2d at 573.  Accordingly, the only state court open to Barrington's claims could not hear his federal claim, and a federal court could not hear his claim against the State.  To pursue both claims, Barrington had to file two different suits in two different courts.  In those circumstances, a doctrine that rests on "a determination that [the instant suit] should have been advanced in an earlier suit" has no application.  *Nestor*, 466 F.3d at 70.

Defendants cite decisions of two courts in this Circuit that have come to a different conclusion.  *See Livingston v. Goord*, 225 F. Supp. 2d 321 (W.D.N.Y. 2002), *vacated in part on other grounds by* 153 Fed.Appx. 769; *Ramsey v. Busch*, 19 F. Supp. 2d

---

[3] In 2009, the Supreme Court of the United States held that this application of Corrections Law § 24 violated the Supremacy Clause insofar as it deprived New York State Supreme Court—a court of general jurisdiction—of jurisdiction over Section 1983 claims against corrections officers.  *See Haywood v. Drown*, 129 S.Ct. 2108 (2009).

16

73 (W.D.N.Y. 1998) (Foschio, M.J.).   These courts held that *res judicata* precluded Section 1983 claims by prisoners who had won compensatory damages in the Court of Claims even though punitive damages were available in the 1983 claims but not in the Court of Claims.   However, the decisions of the *Livingston* and *Ramsey* courts are not binding on this Court and the reasons underlying them are not persuasive.

First, the *Livingston* and *Ramsey* courts reasoned that a plaintiff who has already been awarded compensatory damages has been made whole.  *See Livingston*, 225 F. Supp. 2d at 326; *Ramsey*, 19 F. Supp. 2d at 87.  But that conclusion merely restates the premise of the question:  whether a plaintiff who has been made whole via compensatory damages can nevertheless maintain a suit to recover punitive damages that he could not have maintained in the forum of the prior action.  What is more, claim preclusion does not turn on whether the plaintiff has won or lost the prior action because "the exception in *Davidson* is not based on the relative success of the plaintiff in the initial proceeding, but on the nature of the initial proceeding itself."  *Burgos*, 14 F.3d at 792.

Second, the *Livingston* and *Ramsey* court reasoned that the deterrent benefits of punitive damages do not outweigh the costs for the State of repeated litigation.  *See Livingston*, 225 F. Supp. 2d at 327 ("[H]aving been fully compensated for his injury, plaintiff should not be allowed to force the state to further defend against essentially the same claims in this Court simply so that plaintiff can attempt to pursue a claim for punitive damages."); *Ramsey*, 19 F. Supp. 2d at 87.  However, that policy judgment is not this Court's to make.  A plaintiff may recover punitive damages even when he or she cannot recover actual or nominal damages.  *See King*, 993 F.2d at 297-98.  That rule reflects the judgment of Congress that punitive damages alone justify the costs of

litigating Section 1983 claims.  While a plaintiff in Barrington's position knows in advance that he cannot show uncompensated actual damages, there is no reason why Congress's judgment should be different when considered *ex ante* rather than *ex post*.

Third, the *Livingston* and *Ramsey* courts reasoned that a plaintiff who has chosen to proceed first in the Court of Claims should not be heard to complain of the preclusive effects of a judgment entered in that court.  *See Livingston*, 225 F.2d at 326-27 ("It was plaintiff who chose to litigate these claims first in the Court of Claims."); *Ramsey*, 19 F. Supp. 2d at 86.  But this is not a case where a plaintiff chose to litigate all of his claims in a forum where punitive damages were not available.  Such a plaintiff might rightly be barred from litigating the same or related claims merely to obtain punitive damages.  Barrington, however, made use of a forum that lacked jurisdiction to hear the claim that is now before the Court and for which he may be able to recover punitive damages regardless of whether he can prove actual damages.  In that case, applying *res judicata* would mean that a plaintiff like Barrington has a Hobson's choice of forum:  either sue the State in the Court of Claims without punitive damages or sue the officers in federal court where punitive damages might be available.  Since *res judicata* does not require a plaintiff to make such a choice, it would be unfair to punish Barrington for making it.

Fourth, the *Livingston* and *Ramsey* courts reasoned that an award of punitive damages would cast doubt on the basis of the Court of Claims's decision.  The reasoning runs as follows.  Punitive damages are available in a Section 1983 suit "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith,* 461 U.S. at 56.   However, New York state law "places actions for money

18

damages against [Department of Correctional Services] employees within the jurisdiction of the Court of Claims only where the conduct alleged is within the scope of the officer's employment and in the discharge of his or her official duties." *Woodward v. State*, 805 N.Y.S.2d 670, 673 (3rd Dep't 2005).  Since the Court of Claims entered judgment against the State for its officers' acts, a finding that the officers acted with "evil motive or intent" or "reckless or callous indifference" would cast doubt on the validity of the Court of Claims' judgment.

The specter of inconsistent judgments gives the court pause, but in the circumstances of this case, the specter is nothing more than that.  The State was free to argue that it was not liable for its officers' conduct because the officers were acting beyond the scope of their employment.   But nothing in the record suggests that the State "actually litigated" the issue of scope of employment.  *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 918 (2d Cir. 2010).   On the contrary, the record shows that the State chose to defend the officers' actions as reasonable exertions of force incidental to their duties.  True, permitting an action against individual officers to proceed on the basis of what the State argued on their behalf might prejudice officers in some cases, but not in this one.   If the State had successfully argued that the officers were acting beyond the scope of their employment and the Court of Claims had dismissed the action, the officers would have been potentially liable for both compensatory and punitive damages in any Section 1983 action against them.  Yet because the State made the calculated decision to defend the officers' actions in the Court of Claims and lost, the defendants are seemingly now potentially liable only for punitive damages.  On these facts, preventing Barrington's claim from proceeding would unfairly permit the officers

to escape any obligation they may have to pay punitive damages by pointing to the fact that the State chose to risk paying compensatory damages it had no obligation to pay.[4] Barrington should not have to pay for such a decision in which he had no hand.

Moreover, nothing about an award of punitive damages in this Section 1983 suit on the ground that the officers acted with an "evil motive or intent" would "call into question who is actually responsible for payment of the . . . compensatory damages awarded [Barrington] in the Court of Claims action." *Ramsey*, 19 F. Supp. 2d at 87.  If a finding of "evil motive or intent" means that the officers were acting beyond the scope of their employment, the State may not need to indemnify the officers for any punitive damages award.  *Cf. Sharrow v. State*, 628 N.Y.S.2d 878 (3rd Dep't 1995) (Attorney General properly declined to defend correctional officers in Section 1983 suit based on actions outside the scope of the officers' employment); *Spitz v. Coughlin*, 557 N.Y.S.2d 647 (3d Dep't 1990) (correctional officer who settled federal civil rights suit arising out of an alleged assault of a prisoner was not entitled to indemnity from the State because his actions were outside the scope of his employment).   But the Court is not aware of any law that requires a state officer to reimburse the state for a judgment against it on the basis of actions later adjudged to be beyond the scope of their employment where the State did not even make, never mind succeed in making, an argument to the contrary.

In sum, there is no reason why, in the circumstances here, Barrington's Section 1983 suit implicates the rule against double recovery.  Accordingly, the question is whether *res judicata* bars Barrington's Section 1983 suit against the officers in their

---

[4] For the same reason, is irrelevant that "the state's coffers have already been debited to pay for the costs associated with [the] Court of Claims action in addition to the payment of the compensatory damages." *Ramsey*, 19 F. Supp. 2d at 87.

individual capacities for alleged violations arising out of the May 30 incident.  That question turns on whether Barrington had "a full and fair opportunity to litigate the claim" in the prior action, *EDP Med. Computer Systems, Inc.*, 480 F.3d at 626, and, in particular, "whether the court had the power to grant him the relief sought in the present action." *Bourgos*, 14 F.3d at 792.[5]   He did not.  The Court of Claims did not have the power either to adjudicate a Section 1983 claim against officers in their individual capacities or to order the remedy of punitive damages if Barrington can prove such a claim.  Accordingly, nothing prevents Barrington from pursuing that claim here.[6]

### C.  Failure to State a Retaliation Claim

#### 1.  The May 2005 Incident

Barrington alleges that officers Titka, Burch, Ohl, Crossman, Canazzi, and Marrow assaulted him on May 30, 2005 in retaliation for filing a grievance on May 25, 2005 regarding the confiscation of his radio and the filing of a misbehavior report against him that same day.  The Second Circuit "has held that retaliation against a prisoner for

---

[5] The *Ramsey* court distinguished *Burgos* and *Davidson* on the ground that a plaintiff in Barrington's position "has already been made whole by the compensatory damages awarded him by the Court of Claims." *Ramsey*, 19 F. Supp. 2d at 88.  That reasoning is unpersuasive for the reasons already stated.

[6] Defendants also cite several cases for the proposition that "[w]here a payment is made in full satisfaction of a judgment for a specified item of damage (i.e. plaintiff's injuries), plaintiff is barred from further action against others who may be liable for the same damage, regardless of the legal theory."  (Defs.' Reply at 3.)  None of the cases cited, however, stands for the proposition that a plaintiff who was barred from bringing punitive damage-eligible claims in a prior action cannot bring a related claim in a later action.  Indeed, that is hardly surprising since officers who are liable for punitive damages in their individual capacity are not "liable for the same damage" as the State of New York who has been adjudged liable for compensatory damages.  On the contrary, at least one of the decisions cited by Defendants recognized that a "plaintiff may . . . recover compensatory damages only under [state law] and punitive damages only under [federal law]." *Anderson v. YARP Restaurant, Inc.*, No. 94 Civ. 7543, 1997 WL 27043, at *7 (S.D.N.Y. Jan. 23, 1997).

pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). However, though "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir. 2001), *overruling sub nom. on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) *recognized by Phelps v. Kapnolas*, 308 F.3d 180, 187 n.6 (2d Cir. 2002). "To defeat summary judgment on his First Amendment retaliation claim," a plaintiff is "required to provide evidence that (1) his speech was constitutionally protected, (2) [an official] took an adverse action against him, and (3) there was a causal relationship between the protected speech and the adverse action." *Williams v. Temple*, 349 Fed.Appx. 594, 596 (2d Cir. 2009) (citing *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir. 2003)). Put another way, Barrington "bears the burden of showing, first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

An "adverse action" is retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights. . . ." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir. 2003). The "test is objective, not subjective, and must be so, since the very commencement of a lawsuit would otherwise be dispositive on the issue of chilling." *Davidson v. Bartholome*, 460 F. Supp. 2d 436, 447 (S.D.N.Y. 2006).

### a.  Titka

Defendants argue that Barrington cannot prove as a matter of law that Titka retaliated against him because all Barrington can show is that "Titka made a verbal threat of physical retaliation concerning a grievance" but "cannot proffer any evidence, other than conclusory allegations, that Titka had any involvement in the use of force incident, or had any influence on the events that transpired."  (Defs.' Br. at 11.)

The Court agrees.  Barrington alleges that Titka was involved in confiscating his radio and filing a misbehavior report on May 25, 2005.  But Barrington offers no evidence that Titka was at all involved in the alleged assault of May 30, 2005.  Rather, Barrington merely avers that Titka threatened him that "me and my boys [sic] going to get you" while brandishing a copy of the grievance.

"It is true that some verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action."  *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) (Holwell, J.).  *But see Pledger v. Hudson*, No. 99 Civ. 2167, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005) ("Threats made to an inmate, without more, do not rise to the level of a constitutional violation.") (citing *Dawes*, 239 F.3d at 493 ("Not every unnecessary statement of a prison guard regarding an inmate's exercise of free speech violates the First Amendment.")).  "But not all do.  The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights."  *Mateo*, 682 F. Supp. 2d at 435; *see also Hofelich v. Ercole,* No. 06 Civ. 13697, 2010 WL 1459740, at *2 (S.D.N.Y. Apr. 8, 2010) ("[C]ase law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered.").

Accordingly, courts in this district have dismissed and/or granted summary judgment with respect to retaliation claims based on general threats.  *See, e.g.*, *Dawes*, 239 F.3d at 493 (affirming summary judgment where the plaintiff did "nothing more than state in conclusory terms that the references to him as an 'informant' and a 'rat' for filing [a] grievance . . . opened him up to assault from his fellow inmates"); *Carl v. Griffin*, No. 08 Civ. 4981, 2011 WL 723553, at *5 (S.D.N.Y. Mar. 2, 2011) ("Defendants' alleged 'threats' and/or 'harassment' of Plaintiff were also insufficiently direct or specific to deter an ordinary inmate from exercising his first amendment rights."); *Mateo*, 682 F. Supp. 2d at 434 (dismissing retaliation claim based on threats that plaintiff "should 'wait till he put his hands on me,' and that 'one day he and I will party'") (internal citation omitted).

In fact, this Court has granted summary judgment with respect to a retaliation claim based on a threat nearly identical to Titka's alleged threat to "get" Barrington.  *See Bartley v. Collins*, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (Holwell, J.) (holding that "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action").  *Accord Bilal v. New York State Dept. of Corr.*, No. 09 Civ. 8433, 2010 WL 2506988, at *16 (S.D.N.Y.  June 21, 2010) (M.J. Peck) (same regarding "comment . . . that [plaintiff] was 'lucky' because correction officers 'usually fuck people up for writing a bunch of bullshit grievances'" and "comment that "You're not the only one who can write.  I'm willing to bet you'll break or get broke up"); *Alicea v. Howell,* 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) ("[Defendant's] alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not

24

give rise to a First Amendment retaliation claim.")  Titka is likewise entitled to summary judgment on the retaliation claim.

### b.  Crossman, Canazzi, and Marrow

Defendants argue that because "[t]here is no evidence that Crossman, Canazzi and Marrow had any connection with the issuance of the misbehavior report or the grievance that plaintiff wrote immediately after," Barrington's "retaliation claims should be dismissed . . . for failure to establish a causal link between the alleged adverse action and plaintiff's protected conduct."  (Defs.' Br. at 12).  Defendants' argument assumes that a plaintiff prisoner must always point to more than a temporal relationship between a grievance and alleged retaliatory conduct.  That is not the law in this Circuit.

 "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."  *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009); *see also Colon*, 58 F.3d at 872 (stating that "temporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation").  "[W]here . . . circumstantial evidence of a retaliatory motive is sufficiently compelling, direct evidence is not invariably required." *Bennett*, 343 F.3d at 139; *see also id.* at 138-39 (rejecting argument that plaintiff "failed to produce direct evidence of actual knowledge of the settlement" of his prior 1983 suit that allegedly gave rise to retaliation).  Rather, "circumstantial evidence may be . . . sufficient to raise a genuine issue of material fact precluding the grant of summary judgment."  *Gayle v. Gonyea*, 313 F.3d 677, 684 (2d Cir. 2002) (rejecting argument that

plaintiff "has failed to meet his evidentiary burden because he has failed to submit direct evidence that the report was filed as a retaliatory measure").[7]

The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Espinal*, 558 F.3d at 129. Rather, it has "exercise[d] its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Id.* In this regard, *Espinal* is instructive.

The plaintiff in that case had filed a lawsuit against a correctional officer named Serber and other officers. That suit was dismissed on June 14, 1999. *See id.* at 123. In a later suit, the plaintiff alleged that he was severely beaten by several corrections officers, including Serber, on December 17, 1999 in retaliation for filing his prior lawsuit. *See id.* at 122. The district court granted summary judgment on the prisoner's retaliation claim on the ground that this time period was "too lengthy and the temporal relationship too attenuated to establish a causal connection. . . ." *Id.* at 129. The Second Circuit reversed on the ground that "the passage of only six months between the dismissal of [a] lawsuit

---

[7] It is true that the Second Circuit has suggested that where "circumstantial evidence represented the sum total of [plaintiff's]proof, [it] might be inclined to affirm the grant of summary judgment based on the weakness of [plaintiff's] case." *Colon*, 58 F.3d at 873. And it is also true that "because [courts] recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, [courts] examine prisoners' claims of retaliation with skepticism and particular care." *Id.* at 872 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)). However, this line of skeptical authority is animated by the concern that "claims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse," since "[v]irtually every prisoner can assert such a claim as to every decision which he or she dislikes." *Id.* That concern is far less troubling here where the retaliation that Barrington alleges is an assault rather than administrative action.

and an allegedly retaliatory beating by officers, one of whom . . . was a defendant in the prior lawsuit, is sufficient to support an inference of a causal connection." *Id.* The Second Circuit rejected the argument that there was no evidence that Frasher, a defendant in the retaliation suit but not in the prior lawsuit against Serber and others, knew about the prior suit. Instead, "[v]iewing the evidence in the light most favorable to [the plaintiff], the Second Circuit held that "it is a legitimate inference that Frasher, as a member of Green Haven's emergency response team with Surber on December 17, 1999, learned of the prior lawsuit from Surber, who was a defendant in the earlier lawsuit, or from other officers aware of the lawsuit, and took action in response to [the plaintiff's] protected activity." *Id.* at 130.

It is just so here with respect to Crossman, Canazzi and Marrow. Barrington alleges that he was assaulted five days after he filed a grievance and Titka made a threat that he and his "boys" would "get" Barrington while waving a copy of the grievance. While the threat alone cannot sustain a claim for retaliation, the same breadth that renders the threat insufficient *per se* makes it probative of more widespread retaliatory intent. The reference to "boys" rather than to Ohl and Burch who were present at the time of the threat suggests that Titka intended to share Barrington's grievances with officers other than Ohl and Burch.[8] Moreover, the fact that Titka repeated the threat while stating that he would be off for three days suggests that there were others who planned to retaliate. And the fact that Ohl and Burch were involved both in the grievance and the alleged retaliatory assault corroborates that suggestion. In those circumstances, the close

---

[8] The Court also notes that Barrington was handicapped by his status as a *pro se* incarcerated plaintiff in conducting discovery to establish additional direct evidence of retaliatory intent.

temporal relationship between the grievance and the assault makes a far stronger case for an inference that the assault was carried out with retaliatory intent. *See Rosales v. Fischer*, No. 07 Civ. 10554, 2011 WL 253392, at *9 (S.D.N.Y. Jan. 24, 2011) (denying summary judgment where the alleged "assault occurred just days after Plaintiff filed a grievance"); *Mateo*, 682 F. Supp. 2d at 435 (denying motion to dismiss where alleged retaliatory action occurred one day following grievance).  In response, Defendants have "offered only a conclusory denial of these allegations, failing to submit affidavits or any other admissible evidence concerning what the officials did or did not know."  *Bennett*, 343 F.3d at 139.  Accordingly, summary judgment is denied with respect to Barrington's retaliation claim against Crossman, Canazzi and Marrow.

### c.  Ohl and Burch

Defendants do not appear to argue that summary judgment is warranted with respect to retaliation claims against officers Ohl and Burch.  Indeed, Barrington's evidence suggests that (a) Burch was involved in confiscating Barrington's radio; (b) both Burch and Ohl were present when Barrington asked for a receipt and a grievance form; (c) Ohl was present when Titka threatened Barrington and Titka told Ohl to "look what" Barrington "wrote" and that he "had a good mind writing [Barrington] another misbehavior report"; (d) both officers testified in the Court of Claims Action that they were aware of Barrington's grievance and were required to respond to it; and (e) both officers were involved in the May 30, 2005 incident.  Accordingly, Barrington has pointed to evidence that could create an inference that Ohl and Burch assaulted him in retaliation for filing a grievance.  Defendants' motion for summary judgment is therefore denied as to Barrington's retaliation claim against Ohl and Burch.

## 2.  The August 2008 Incident

Defendants argue that Barrington's claim that Funk retaliated against him for filing this lawsuit against his fellow officers should be dismissed because "[i]t is implausible to believe that a corrections officer would issue a retaliatory misbehavior report because an inmate brought a lawsuit against other corrections officers alleging events not involving him."  (Defs.' Reply at 5.) [9]  The Court is not convinced.  The notion of a corrections officer trying to protect his own is hardly fantastical as a matter of law.

Defendants also argue that Barrington's "claim against Funk is wholly conclusory and unsupported by factual allegations."  (Defs.' Br. at 13.)   Again, however, Defendants ignore that "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."  *Espinal*, 558 F.3d at 129.  That is true here.  Funk's alleged assault occurred just two weeks after entry of judgment in the Court of Claims Action and Ohl had been served in this action, and on the same day that Burch was served in this action.

On the other hand, while "direct evidence is not invariably required," it is also not invariably unnecessary.  *Bennett*, 343 F.3d at 139.  The Second Circuit has stated only that "temporal proximity between an inmate's lawsuit and disciplinary action *may* serve as circumstantial evidence of retaliation," *see also Colon*, 58 F.3d at 872 (emphasis added), where  "circumstantial evidence of a retaliatory motive is sufficiently compelling. . . ."  *Bennett*, 343 F.3d at 139.

---

[9] Even if *res judicata* does bar claims related to the May 30, 2005 incident, it could not bar Barrington's claims for retaliation in 2008.  "While claim preclusion bars relitigation of the events underlying a previous judgment, it does not preclude litigation of events arising after the filing of the complaint that formed the basis of the first lawsuit."  *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000).

Barrington has averred that Funk told him on several occasions that he was present during the May 30, 2005 incident and has asked him if his leg hurts. (Compl. ¶ 54.) Taking that sworn statement as true, Funk's statements would tend to show that he was aware of the incident giving rise to the lawsuits for which he allegedly retaliated. That would in turn suggest that Funk was sufficiently connected to the other defendant officers that he was aware of the lawsuits against them. Just as Ohl's and Burch's presence during the May 25, 2005 incident and their participation in the May 30, 2005 incident suggested that the latter was retaliation for a grievance related to the former, Funk's presence during the May 30, 2005 incident suggests that the August 7, 2008 incident was retaliation for lawsuits related to the former.

It is true that Ohl and Burch were both subjects of Barrington's grievance whereas Funk was not a defendant in Barrington's lawsuits. But as set forth above with respect to defendants Crossman, Canazzi and Marrow, *Espinal* appears to stand for the proposition that the sufficiency of circumstantial evidence of retaliation turns largely on the connection between the officer who has allegedly retaliated and the officer who has already been sued. Indeed, the Second Circuit in that case inferred officers' knowledge of a *prior* lawsuit against Serber based on their presence with Serber at an incident allegedly retaliating for that lawsuit. *See Espinal*, 558 F.3d at 130. Similarly, the Court has inferred Crossman's, Canazzi's and Marrow's knowledge of Barrington's prior grievance against Titka, Burch, and Ohl from Crossman's, Canazzi's ,and Marrow's presence with Burch and Ohl at the alleged retaliation for the grievance. Perhaps there is less reason to infer from Funk's presence at an alleged retaliatory incident his knowledge of a subsequent lawsuit based on that incident. But there is *some* reason to infer Funk's

knowledge of Barrington's lawsuits.  And an inference that Funk knew about the lawsuits, together with the facts that the other defendants had been served in this action the same day and a judgment had been entered against the State for their conduct just weeks before the August 7, 2008 incident, establishes a genuine issue of material fact as to whether Funk's alleged assault was in retaliation for this action or the Court of Claims Action or both.  Summary judgment with respect to Barrington's retaliation claim against Funk is therefore unwarranted.

### D.  Injunctive Relief

As part of his prayer for relief, Barrington requests an order directing Green Haven to install security cameras.  Defendants contend that this request is barred by the Prison Litigation Reform Act ("PLRA") which provides in relevant part that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of the particular plaintiff."  18 U.S.C. § 3626(a)(1)(A).  This "tailoring requirement does not affect the availability of injunctive relief.  Rather, it affects the scope of the equitable relief a court may order once that court determines that an injunction should issue."  *Dodge v. County of Orange*, 282 F. Supp. 2d 41, 86 (S.D.N.Y. 2003).  *See also Gomez v. Vernon,* 255 F.3d 1118, 1129 (9th Cir. 2001) ("Although the PLRA significantly affects the type of prospective injunctive relief that may be awarded, it has not substantially changed the threshold findings and standards required to justify an injunction.").  However, it is immaterial if equitable relief is warranted if the form of equitable relief Barrington has requested—a proposed order directing the installation of securities cameras—is beyond the narrow scope permitted by the PLRA.

Barrington's proposed remedy is far broader than necessary to correct the alleged violation of his rights. In the first place, it is hard to understand how prospective relief could correct a past violation. Moreover, even assuming that the PLRA's narrow tailoring requirement could permit an injunction designed to prevent future repetition of a past assault against a single inmate, installing security cameras throughout Green Haven is far broader than necessary. An order to do so might be warranted if Barrington sought relief on behalf of a wider group of individuals alleging ongoing violations resulting from a deficient security policy. But such claims are not before the Court because Barrington has stated a claim only for past violations of his own rights. Accordingly, Barrington's proposed order is unwarranted as a matter of law and summary judgment is granted to Defendants with respect to that requested relief.

### E.  Appointment of Counsel

"The court may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1). "Broad discretion lies with the district judge in deciding whether to appoint counsel pursuant to this provision." *Hodge v. Police Officers,* 802 F.2d 58, 60 (2d Cir. 1986). Nevertheless, the Second Circuit has instructed that, "[i]n deciding whether to appoint counsel . . . the district judge should first determine whether the indigent's position seems likely to be of substance." *Id.* at 61. Barrington's claim certainly meets that threshold. Barrington has already prevailed in the Court of Claims Action regarding the events at issue here and has demonstrated sufficient issues of material fact to defeat summary judgment. True, "withstanding a motion for summary judgment is not always enough," since "'[i]f mere bald assertions by an indigent, which technically put a fact in issue and suffice to avert summary judgment,

required appointment of [counsel], the demand for such representation could be

overwhelming.'" *Crenshaw v. Herbert*, 2011 WL 310324, at *2 (2d Cir. Feb. 2, 2011)

(quoting *Hodge*, 802 F.2d at 60). Rather, where a claim appears to have some merit, "the

court should then consider the indigent's ability to investigate the crucial facts, whether

conflicting evidence implicating the need for cross-examination will be the major proof

presented to the fact finder, the indigent's ability to present the case, the complexity of

the legal issues and any special reason in that case why appointment of counsel would be

more likely to lead to a just determination." *Id.* at 61-62.

> These factors plainly weigh in favor of appointing counsel here.
>
> Throughout the case [Barrington] has been incarcerated in the DOCS system, severely limiting his ability to investigate and present the crucial facts in what appears to be a fact-intensive case. [N]ot the least of those restrictions was his inability to take depositions of the DOCS Officers . . . . In like manner, [his] ability to develop the facts as to the nature and extent of the other defendants' involvement or noninvolvement was seriously limited. In a case such as this, where the crux of the dispute centers on the reason for the [assault], a deposition is incomparably preferable to written interrogatories as a vehicle for seeking out useful evidence, not only because of the greater ease in shaping later questions based on earlier answers but also because the interrogatory answers are typically prepared by lawyers rather than through the uncounseled responses of the witnesses.

*Hendricks v. Coughlin*, 114 F.3d 390, 394 (2d Cir. 1997). *See also Hodge*, 802 F.2d at

61. In addition, "if a case's factual issues turn on credibility, this should weigh on the

side of appointing counsel since it is more likely that the truth will be exposed where

both sides are represented by those trained in the presentation of evidence and in cross-

examination." *Id.* (quotation marks omitted). This is such a case. The motive of the

officers in assaulting Barrington will turn largely on their testimony about their intentions

toward Barrington and what they knew about his grievances. Indeed, the Court of Claims

relied largely on a credibility determination. (*See* Bauman Dec. Ex. I at 12.)

Accordingly, if Barrington requests counsel, the Court will request an attorney to represent him at trial in this action.  Barrington should make any request for counsel within 30 days.  If counsel is appointed, the Court will consider whether additional discovery is warranted.  *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). ("If documentary discovery does tend to support the claim or if the documentary record seems unduly sparse, the action may proceed to fuller discovery at the district court's discretion.").

## CONCLUSION

For the foregoing reasons, Defendants' motion **[62]** for summary judgment is GRANTED in part and DENIED in part.   Defendants are entitled to summary judgment with respect to all claims against the State of New York, the retaliation claim against defendant Titka, and Barrington's request for an order directing the Department of Correctional Services to install security cameras at Green Haven.   In all other respects, summary judgment is not warranted.   Barrington should make in writing any request for counsel within 30 days.


SO ORDERED.

Dated: New York, New York
      August 24, 2011

                                        Richard J. Holwell
                                      United States District Judge

35